**PUBLISH**

**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**SEP 25 2000**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

ALVIE JAMES HALE, also known as
Alvin J. Hale,

     Petitioner-Appellant,

v.

GARY GIBSON, Warden, Oklahoma
State Penitentiary,

     Respondent-Appellee.

No. 99-6083

---

**Appeal from the United States District Court**
**for the Western District of Oklahoma**
**(D.C. No. CIV-96-1073-L)**

---

Gloyd L. McCoy, Coyle & McCoy, Oklahoma City, Oklahoma, for Petitioner-
Appellant.

Jennifer B. Miller, Assistant Attorney General (W.A. Drew Edmondson, Attorney
General of Oklahoma, with him on the brief), State of Oklahoma, Oklahoma City,
Oklahoma, for Respondent-Appellee.

---

Before **SEYMOUR**, Chief Judge, **PORFILIO** and **EBEL**, Circuit Judges.

---

**EBEL**, Circuit Judge.

---

     Petitioner Alvie James Hale was tried and convicted by jury in the District

Court of Pottawatomie County, Oklahoma on one count of Murder in the First

Degree and one count of Kidnapping for Extortion.  The jury recommended death for the crime of Murder in the First Degree and life imprisonment for the crime of Kidnapping for Extortion.  After unsuccessful direct and post-conviction appeals in state court, Mr. Hale filed a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.  The district court denied the writ.  Mr. Hale appeals, and we AFFIRM.

## BACKGROUND

Hale was charged with the murder and kidnapping of William Jeffrey Perry ("Perry") of Tecumseh, Oklahoma.  Perry's parents owned and managed a local bank.  When Perry failed to arrive for work Tuesday morning, October 11, 1983, his sister, Veronica, went to his home to locate him.  She found his automobile in the driveway, the front door to his home open, his clothes laid out for work, and Perry missing.  The only sign of a struggle was an upset alarm clock.  At 10:30 a.m. that day, Perry's mother received the first of a series of telephone calls concerning her son from an unidentified man.  The second call came at 1:30 p.m. and was received by Perry's sister who was asked "Where is the money, where is $350,000?"  During each call, the family asked to speak with Perry and were told that Perry was at a lake cabin and could not be brought to a phone, but that he would be released after the caller received $350,000 from the family.  The family could not arrange to have the money until the following day.

Meanwhile, at approximately 7:00 a.m. on the morning of October 11, 1983, a man identified as Hale came to the bathroom window of the house where Janet Miller lived. He asked her if he could use a telephone and she told him she did not have a phone. As the man went back to his white station wagon in her driveway, a second man dressed only in undershorts yelled for help from an adjacent field. Hale hurried to the spot where the second man was located, who was bent over with pain, and pulled him over the fence into the automobile.

The next day, Mrs. Perry received a phone call directing her to go to the pay phone at a 7-11 store where she would receive further instructions. When Mrs. Perry reached the 7-11 she received a phone call on the pay phone at the store that directed her to another 7-11. During this phone call, Mrs. Perry spotted Hale sitting in a red and white pickup across the street. Mrs. Perry then proceeded to the second location, where she again received a phone call which told her where to drop off the ransom money. Mrs. Perry followed the caller's instructions and deposited the money at the designated location. While Mrs. Perry was dropping off the money, she observed Hale's truck approaching her location and was able to identify Hale as the driver of the vehicle. After Hale retrieved the money, F.B.I. agents pursued Hale in a high speed chase through Oklahoma City. The pursuit ended when Hale's vehicle finally came to a stop after he hit a drainage ditch, went airborne, and collided head on with an F.B.I.

- 3 -

agent's vehicle. All the money Mrs. Perry had delivered was found in the truck and Hale was taken into custody at that time.

Hale's father gave law enforcement officers consent to search his home and property. During the search, officers found the victim's body wrapped in a dark colored trampoline tarp within a metal storage shed, one which fit a trampoline frame found at Hale's own home. Perry had been shot a number of times. Also located at the house was a cream-colored station wagon Hale had used the morning of October 11th. A blood-stained towel containing a hair identified as Hale's was found in the vehicle. In addition, blood was found on the shoulder harness in the car which was consistent with Perry's blood. A .38 caliber revolver was also found in a kitchen cabinet. Two bullets found in Perry's head were determined by a ballistics expert to have come from that revolver to the exclusion of all other weapons.

Hale was found guilty of Murder in the First Degree and Kidnapping for Extortion.[1] During the second stage of Hale's trial, the prosecutor sought the death penalty on the kidnapping as well as the first degree murder charge. The prosecutor argued three aggravating circumstances for the kidnapping charge[2] and

---

[1] Hale was also convicted in a separate proceeding in federal court of the charge of Affecting Interstate Commerce by Extortion based upon his action in this case.

[2] The aggravating circumstances for kidnapping included:

(continued...)

- 4 -

four aggravating circumstances for the murder charge.[3]  The jury found two aggravating circumstances for kidnapping–that it was done for remuneration and was heinous, atrocious, or cruel–and sentenced Hale to life imprisonment.  The jury found the existence of two aggravators on the murder charge–the murder was heinous, atrocious, or cruel and the murder was committed to avoid lawful arrest–and sentenced Hale to death.  On March 22, 1984, the trial judge sentenced Hale in accordance with the jury's recommendation.

Hale appealed, raising twenty-two propositions of error.  The Oklahoma Court of Criminal Appeals ("OCCA") affirmed Petitioner's convictions and sentences.  Hale v. State, 750 P.2d 130 (Okla. Crim. App. 1988) ("Hale I").  Certiorari review was subsequently denied.  Hale v. Oklahoma, 488 U.S. 878, 109 S. Ct. 195, 102 L. Ed. 2d 164 (1988).  Hale then pursued post-conviction relief

---

[2](...continued)
        (1) the person committed the Kidnapping for Extortion for remuneration or the promise of remuneration;
        (2) the Kidnapping for Extortion was especially heinous, atrocious, or cruel;
        (3) the existence of a probability that the Defendant would commit criminal acts of violence that would constitute a continuing threat to society.

[3] The aggravating circumstances for murder included:
        (1) the person committed the murder for remuneration or the promise of remuneration;
        (2) the murder was especially heinous, atrocious, or cruel;
        (3) the murder was committed for the purpose of avoiding or preventing a lawful arrest or prosecution;
        (4) the existence of a probability that the Defendant would commit criminal acts of violence that would constitute a continuing threat to society.

which was denied by the District Court of Pottawatomie County following an evidentiary hearing. Hale appealed to the OCCA raising thirteen grounds for relief. The OCCA affirmed the trial court's denial of post-conviction relief, finding twelve of the allegations waived because they were either raised on direct appeal or could have been. Hale v. State, 807 P.2d 264 (Okla. Crim. App. 1991) ("Hale II"). The OCCA denied relief on the final claim. Certiorari review was again denied. Hale v. Oklahoma, 502 U.S. 902, 112 S. Ct. 280, 116 L. Ed. 2d 231 (1991). On April 28, 1992, Hale filed a second application for post-conviction relief in the District Court of Pottawatomie County. All relief was denied. On appeal, the Court of Criminal Appeals again affirmed the denial of post-conviction relief. Hale v. State, 934 P.2d 1100 (Okla. Crim. App. 1997) ("Hale III"). Hale then filed a petition for writ of habeas corpus on February 28, 1997 in the United States District Court for the Western District of Oklahoma, raising twenty issues. That petition was denied on January 28, 1999 and Hale was granted a certificate of appealability on all issues.

On appeal, Hale makes the following thirteen claims of constitutional error: (1) he was (a) denied effective assistance of counsel through a conflict of interest and (b) denied due process when his counsel's motion to withdraw from representation was denied outside of Hale's presence, (2) he was denied effective assistance of counsel during the punishment stage of his trial, (3) he was denied

effective assistance of counsel during voir dire, (4) he was denied effective assistance of counsel when counsel failed to object to the admission of other crimes evidence, (5) he was denied effective assistance of counsel during counsel's second stage closing remarks, (6) he was denied effective assistance of counsel during counsel's first stage closing remarks, (7) he was denied a fair trial due to an improper instruction to the jury that kidnapping was a death-eligible offense and denied effective assistance of counsel for his counsel's failure to object to the improper jury instruction, (8) he was denied due process because of the late filing of the Bill of Particulars and denied effective assistance of counsel when his attorney failed to object to the late filing, (9) his convictions for murder and kidnapping violated double jeopardy principles, (10) the government committed a violation of Brady v. Maryland, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963), (11) he was denied a fair trial due to the trial court's failure to grant a change of venue, (12) there was insufficient evidence to support the aggravator that Hale committed murder to avoid lawful arrest, and (13) there was insufficient evidence to support the "heinous, atrocious, or cruel" aggravator.

## DISCUSSION

A. Standard of Review

>When reviewing the denial of a habeas corpus petition, we are generally subject to two different frameworks of review, depending upon whether the state courts addressed the merits of the claim for relief. If the state courts have not heard the claim on its merits, we

> review the district court's legal conclusions de novo and its factual findings, if any, for clear error. If the state courts have addressed the claim on its merits, we review the state court ruling under the standard enunciated under 28 U.S.C. § 2254.

Smallwood v. Gibson, 191 F.3d 1257, 1264 (10th Cir. 1999) (footnote and citation omitted). Because Mr. Hale filed his petition for habeas relief nearly one year after the effective date of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), AEDPA applies to his petition. See Lindh v. Murphy, 521 U.S. 320, 336, 117 S. Ct. 2059, 138 L. Ed. 2d 481 (1997).

Under AEDPA's provisions, a federal court is precluded from granting habeas relief on any claim adjudicated on the merits by the state court, unless the state proceeding "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court," 28 U.S.C. § 2254(d)(1), or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," 28 U.S.C. § 2254(d)(2). "In addition, we presume the factual findings of the state court are correct unless petitioner can rebut this presumption by clear and convincing evidence." Smallwood, 191 F.3d at 1265 (citing 28 U.S.C. § 2254(e)(1)).

The Supreme Court recently construed the review standard set forth in 28 U.S.C. § 2254(d)(1). See Williams v. Taylor, ___ U.S. ___, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000). In order for Hale to secure a writ under section (d)(1) he

must satisfy one of the following two conditions: "the state-court adjudication resulted in a decision that (1) 'was contrary to . . . clearly established Federal law, as determined by the Supreme Court of the United States,' or (2) 'involved an unreasonable application of . . . clearly established Federal law as, determined by the Supreme Court of the United States.'" Williams, __ U.S. __, 120 S. Ct. at 1523 (omissions in original).

The Court determined that a state court decision is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts." Id. A state court decision is an unreasonable application of federal law "if the state court identifies the correct governing legal principle from this Court's decision but unreasonably applies that principle to the facts of the prisoner's case." Id. When a federal habeas court is making an "unreasonable application" inquiry, the Court stated that it "should ask whether the state court's application of clearly established federal law was objectively unreasonable." Id. at 1521. The Court stopped short of defining the term "unreasonable" as it is used in AEDPA, but did note that while it is "difficult to define," it is "a common term in the legal world and, accordingly, federal judges are familiar with its meaning." Id. at 1522. The

Court was careful to point out, however, that "an unreasonable application of federal law is different from an incorrect application of federal law." Id.

We now turn to our review of Mr. Hale's claims in light of Williams.

## I. Ineffective Assistance of Counsel and Related Claims

## A. Motion to Withdraw

Hale first argues that he was denied the effective assistance of counsel because of a conflict of interest. Hale contends that his trial counsel suffered under a conflict of interest based on trial counsel's assertions to the court in a motion to withdraw. Hale's trial counsel, Mr. Van Wagner, was appointed by the trial court to represent Hale on November 30, 1983. Van Wagner testified at the post-conviction hearing that the first thing he did after being appointed was to file an Application to Withdraw with the trial judge. The written application stated in pertinent part:

> He [Van Wagner] knows said Defendant whose office was across the hall from this applicant's law office in 1982 and portions of 1983, and this applicant believes that the Defendant attempted to burglarize his law office in early 1983 along with other offices in the building, although there was not sufficient evidence to press charges. Because of this, this applicant has a personal dislike, distrust and animosity toward the Defendant which will prevent the desirable communication and trust that is necessary to an attorney-client relationship.

After Van Wagner filed this application he had a meeting with the trial judge. There is no transcript of the meeting between Mr. Van Wagner and the judge; however, following the meeting, the judge denied the application to withdraw and the following "court minute" was handwritten at the bottom of the application: "Above application denied after consideration by the Court. The Court is of the opinion that the attorney will not permit personalities to effect [sic] his relationship or representation of defendant." Hale argues on appeal that the asserted animosity of Van Wagner towards Hale was a conflict of interest which the judge failed to inquire into adequately and resolve properly. In addition, Hale argues that his due process rights were violated because he was not present while his attorney discussed the application to withdraw with the trial judge.

In Hale's state direct appeal, he raised only the conflict of interest issue, and he failed to raise the procedural due process claim. With regard to the conflict of interest claim, the OCCA stated:

> Trial counsel asked to withdraw from representing Hale because he suspected appellant of attempting to burglarize his offices and thought that his personal animosity might hinder communications with Hale. The trial court held a hearing out of Hale's presence and declined the application. We find no abuse of the court's discretion in requiring counsel to overcome his personal feelings and to represent Hale. There is no constitutional right to an attorney client relationship free of animosity. Morris v. Slappy, 461 U.S. 1, 103 S. Ct. 1610, 75 L. Ed. 2d 610 (1983).

Hale I, 750 P.2d at 135. In his state application for post-conviction relief, Hale, for the first time, raised his procedural due process claim based on his absence from the hearing on the motion to withdraw, in addition to his previously raised conflict of interest claim. The OCCA denied consideration of the issue, stating that the conflict of interest claim had been addressed on direct appeal and was therefore barred from review on post-conviction. Hale II, 807 P.2d at 267. It appears that the procedural due process claim has never been addressed by the OCCA. Because the state does not raise procedural bar on appeal, we will consider the procedural due process claim on the merits. See Hooks v. Ward, 184 F.3d 1206, 1223 (10th Cir. 1999).

## 1. Procedural Due Process Claim

Hale first argues that his constitutional rights were violated when he was not notified of or permitted to attend the hearing or meeting at which his court-appointed counsel discussed his motion to withdraw with the trial judge. Because the OCCA did not address this claim on the merits, we apply pre-AEDPA standards to this portion of Hale's claim. See Hooks, 184 F.3d at 1223. The district court below concluded that Hale's due process rights were not violated by his absence from the hearing on the motion to withdraw because it was not a stage of the proceedings in which his presence was required. The question of whether a

defendant has a constitutional right to be present at a particular stage of his trial is a legal question that we review de novo. See United States v. Gomez, 67 F.3d 1515, 1528 (10th Cir. 1995).

The Supreme Court has held that a defendant "has a due process right to be present in his own person whenever his presence has a relation, reasonably substantial, to the fullness of his opportunity to defend against the charge." Kentucky v. Stincer, 482 U.S. 730, 745, 107 S. Ct. 2658, 96 L. Ed. 2d 631 (1987) (internal quotation marks omitted). When a defendant's presence, however, would be "useless" or "the benefit but a shadow," his presence is not constitutionally required. Id. Due process requires a defendant's presence only whenever "a fair and just hearing would be thwarted by his absence." Id. "Thus, a defendant is guaranteed the right to be present at any stage of the criminal proceeding that is critical to its outcome if his presence would contribute to the fairness of the procedure." Id. In Stincer, the Supreme Court found no due process violation occurred as a result of the defendant's exclusion from a hearing to determine two young witnesses' competency to testify. In reaching this conclusion, the Court stressed the fact that no substantive testimony that the two girls would give during trial was revealed during the hearing and the defendant did not make a showing that his presence would have ensured a more reliable determination of the competence of the two young witnesses to testify against

him.  Id. at 745-46. Therefore, the Court concluded that the defendant's absence from the hearing could not have affected his ability to defend himself at trial.

This court considered a similar legal issue as the one presented here in United States v. Oles, 994 F.2d 1519 (10th Cir. 1993).  In Oles, this court held that the defendant's absence from a preliminary hearing, in which the court determined whether court appointed counsel would withdraw in favor of potential retained counsel, did not violate the defendant's due process rights.  Id. at 1525. In reaching this holding, we found that because no substantive matters relating to the charges pending against the defendant were discussed at the hearing and because the defendant did not establish that his presence would have contributed to the fairness of the trial, the defendant's absence did not "impinge on [the defendants'] opportunity to defend against [the charges], or affect the fairness of the entire trial."  Id.

Similarly, in Green v. Johnson, 116 F.3d 1115 (5th Cir. 1997), the Fifth Circuit held that a defendant's due process rights were not violated when the defendant was absent during a meeting between the judge and one of his two attorneys concerning the one attorney's motion to withdraw.  Id. at 1124.  In the meeting, the attorney argued that her relationship with her co-counsel had deteriorated to the point that they did not communicate about the case directly, and she felt this situation was hindering her ability to represent the defendant.  Id.

The Fifth Circuit held that the defendant's exclusion from the meeting did not thwart the fairness and just treatment of the issue during the meeting or the fairness of the defendant's overall representation. Id. Moreover, the court found that although the defendant had stated that if he was present he could have provided the court with important information about the conflict, the defendant failed to provide the court with such information or explain how it would have affected the ruling. Id.

Like the defendants in Stincer, Oles, and Green, Hale's absence from the conference between the trial judge and his counsel did not affect his ability to defend against the charges he was facing nor did it thwart the fairness of that conference or his overall representation. There is no allegation that the trial judge and counsel, Mr. Van Wagner, discussed the substantive charges against Hale. The conference discussed whether Van Wagner's asserted subjective feelings toward Hale would affect his representation. There is no suggestion that the conference addressed, or attempted to resolve, the truth of the underlying suspicions that gave rise to Van Wagner's ill will nor was there an allegation of a breakdown in communications. As in Green, Hale does not indicate what he could have done had he been present that would have had an effect on the ruling by the trial judge or affected the fairness of his trial or the presentation of his defense. This court finds that Hale's exclusion from the proceeding did not result

in an unfair proceeding or trial. Rather, the trial judge, after being presented with Van Wagner's petition, specifically found that trial counsel's relationship and representation of the defendant would not be affected. Similarly, Van Wagner testified at the post-conviction hearing that his "vague suspicion" that Hale had attempted to burglarize his office did not affect his representation of Hale at all. Hale has presented no evidence to refute the above findings and testimony. We conclude that the meeting on the motion to withdraw did not impinge on Hale's opportunity to defend against the charges against him or affect the fairness of the entire trial; thus we find no constitutional violation.

### 2. Conflict of Interest

The second part of Hale's claim urges this court to find that an actual conflict of interest existed between Hale and Mr. Van Wagner because Mr. Van Wagner had a vague suspicion that Hale might have burglarized his offices. Because the OCCA addressed this claim on the merits, we review under AEDPA standards.

The Sixth Amendment guarantees the effective assistance of counsel to a defendant in a criminal trial. See Selsor v. Kaiser, 81 F.3d 1492, 1496-97 (10th Cir. 1996). "The Sixth Amendment right to effective assistance of counsel encompasses the correlative right to representation that is free from conflicts of

interest." Id. at 1497 (internal quotation marks omitted). This court has explained that the

> [t]ypical conflict of interest case[] giving rise to [a] claim[] of ineffective assistance of counsel involve[s] multiple representation of co-defendants at a single trial. However, a defendant's right to counsel free from conflicts of interest is not limited to cases involving joint representation of co-defendants but extends to any situation in which a defendant's counsel owes conflicting duties to that defendant and some other third person.

United States v. Cook, 45 F.3d 388, 393 (10th Cir. 1995) (internal citations, quotation marks, and alterations omitted). Implicit in the latter category of conflicts noted in Cook is the notion that a conflict may also arise where a lawyer's self-interest is adverse to the interest of his client. See Smith v. Lockhart, 923 F.2d 1314, 1320 (8th Cir. 1991) ("In general, a conflict exists when an attorney is placed in a situation conducive to divided loyalties."); see also Beets v. Scott, 65 F.3d 1258 (5th Cir. 1995) (discussing conflict of interest when attorney's self-interest conflicts with duty of loyalty to defendant). Hale argues that this situation exists in his case because his counsel informed the court that he disliked and distrusted Hale because he suspected that Hale may have burglarized his law offices approximately a year earlier. Hale suggests that this animosity demonstrates that his interests and Van Wagner's interests were in conflict. Hale's interpretation of the law is too broad. Under Hale's view, any time that counsel dislikes his or her client, the defendant could claim a conflict of interest.

- 17 -

This is not the state of the law. A conflict does not arise any time defendant and his counsel had prior dealings that may have been at odds; rather, the interests of counsel and defendant must be divergent in the current litigation, such that the attorney has an interest in the outcome of the particular case at issue that is adverse to that of the defendant. See United States v. Soto Hernandez, 849 F.2d 1325, 1329 (10th Cir. 1988) (stating that to show conflict of interest, the defendant must demonstrate that counsel "actively represented conflicting interests" in the pending case); see also Beets, 65 F.3d at 1273 (condemning as a conflict the execution of media and literary rights fee arrangements between the attorney and his client during the pendency of a representation but declining to award habeas relief because of a lack of a showing of prejudice).[4]

In the present case, there is no evidence that Van Wagner had any interest in the outcome of the current case that would conflict with Hale's interest. The fact that Van Wagner had a suspicion that Hale may have burglarized his office at an earlier time is unrelated to the case for which he was currently representing Hale. Although Van Wagner would have a conflict of interest if he were

_____

[4] As discussed below, the fact that the potential animosity between the defendant and his counsel did not rise to the level of a conflict of interest does not preclude defendant from showing that his counsel was ineffective as a result of the animosity. It simply means that his claim is not evaluated under the standard for conflicts of interest articulated by the Supreme Court in Culyer v. Sullivan, 446 U.S. 335, 100 S. Ct. 1708, 64 L. Ed. 2d 333 (1980), and Holloway v. Arkansas, 435 U.S. 475, 98 S. Ct. 1173, 55 L. Ed. 2d 426 (1978).

representing Hale for the robbery of his law office because their interests in that case would be adverse, representation of Hale in a wholly unrelated case does not give rise to a conflict of interest. Cf. Church v. Sullivan, 942 F.2d 1501, 1511 n.8 (10th Cir. 1991) (finding conflict of interest where defense counsel may have to cross-examine a witness who is a former client only when counsel's previous representation of the witness is "substantially related to the attorney's later representation of [the current client]" (alteration in original omitted)). The fact that Van Wagner did not like Hale or did not trust him does not rise to the level of a conflict of interest. Personality conflicts are not conflicts of interest. Morris v. Slappy, 461 U.S. 1, 13, 103 S. Ct. 1610, 75 L. Ed. 2d 610 (1983). Thus, we decline to find a conflict of interest in this situation.

Although there is no conflict of interest, we have recognized that "a complete breakdown in communication between an attorney and client may give rise to a presumption of ineffectiveness." Romero v. Furlong, 215 F.3d 1107, 1111 (10th Cir. 2000) (alterations in original omitted). In this case, however, there is no evidence that there was a breakdown in communication between Van Wagner and Hale. The evidence, instead, supports the conclusion that client and counsel maintained adequate communication. Van Wagner testified at the state post-conviction hearing that he met with Hale many times prior to the trial and discussed the case and the strategy they would follow at trial. In addition, Hale

testified at the post-conviction hearing that he did not have any difficulty communicating with Van Wagner. Thus, there is no evidence from which we could presume ineffective assistance based on a total breakdown in communication.

There being no conflict of interest and no evidence of a total breakdown in communication, we can vacate Hale's conviction on Sixth Amendment grounds only if he can show ineffective assistance of counsel within the meaning of Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). However, given the concession by Hale's counsel that he carried animosity towards Hale due to his suspicion that Hale might have previously burglarized his law office, we believe it is appropriate to scrutinize counsel's performance with a somewhat more critical eye.[5] We turn, then, to the specific allegations of trial conduct that Hale argues constituted ineffective assistance of counsel.

---

[5] Following the hearing on Van Wagner's application to withdraw as counsel, the trial court determined that the personality issues would not affect the relationship with the defendant or the representation. Although this finding as to whether counsel should have been removed at the time the motion was made is one we presume to be correct under AEDPA, it does not preclude a finding that animosity may have infected the actions and decisions of counsel during trial and after the court made its finding. The trial court has made no finding to which we must give a presumption of correctness with regard to whether animosity existed during trial. The court simply stated that it believed prior to trial that counsel could overcome the animosity.

## B. Mitigation Evidence

Hale argues his trial counsel, Mr. Van Wagner, was ineffective during the penalty phase of the trial. Specifically, Hale contends that his attorney failed adequately to investigate, prepare, and present a second stage defense. Hale focuses on the lack of any mitigation evidence during the sentencing phase, which he asserts was readily available had Van Wagner done any amount of investigation or preparation. According to Hale, there exists a reasonable probability that had the jury heard the undiscovered mitigation evidence, it would not have voted for death.

On direct criminal appeal, the OCCA rejected this claim, stating that counsel's decision with regard to witness testimony is a matter of trial tactics which the court would not second guess. See Hale I, 750 P.2d at 142. On Hale's first state habeas petition, the lower court held an extensive evidentiary hearing. Following the hearing, the court denied relief and the OCCA subsequently rejected the claim a second time, reiterating that what witnesses should be used at trial are a matter of trial strategy, and further stating that Hale had failed to meet his burden to show that but for trial counsel's decisions, the result of the trial would have been different. The OCCA then pointed out that Hale had raised this issue on direct appeal, and thus was barred from raising it again on post-conviction. See Hale II, 807 P.2d at 267.

Claims of ineffective assistance of counsel are mixed questions of law and fact. See Wallace v. Ward, 191 F.3d 1235, 1247 (10th Cir. 1999) (applying AEDPA). "To establish ineffective assistance of counsel, a petitioner must prove that counsel's performance was constitutionally deficient and that counsel's deficient performance prejudiced the defense." Id. (citing Strickland, 466 U.S. at 687 (alteration in original omitted). With regard to the first prong, to prove deficient performance Hale "must overcome the presumption that counsel's conduct was not constitutionally defective. Judicial scrutiny of counsel's performance is highly deferential." Wallace, 191 F.3d at 1247 (citation omitted). If constitutionally deficient performance is shown, then Hale must demonstrate that "there is a 'reasonable probability' that the outcome would have been different had those errors not occurred." Brecheen v. Reynolds, 41 F.3d 1343, 1365 (10th Cir. 1994). However, when a petitioner is specifically challenging the imposition of the death sentence during the punishment phase of the trial, the prejudice prong of Strickland focuses on whether there is "a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." Stafford v. Saffle, 34 F.3d 1557, 1564 (10th Cir. 1994). Courts may address the performance and prejudice components in any order and need not address both if

a defendant fails to make a sufficient showing of one.  See Strickland 466 U.S. at 697.

Hale's trial counsel did not give an opening statement at the beginning of the penalty phase and presented no mitigating evidence.  Counsel addressed the jury during the second stage only in his closing argument in which he urged the jurors to bestow mercy on Hale and give him life in prison.  Hale argues on habeas that his counsel should have introduced the testimony of persons in the community who knew him both as a youth and as an adult, in his capacity as a father, businessman, and friend.

"[T]he failure to present available mitigating evidence is not per se ineffective assistance of counsel."  Brecheen, 41 F.3d at 1368.  Instead, it is necessary to evaluate the reasons for counsel's failure to present mitigating evidence and then determine whether that failure, if due to deficient performance by the attorney, prejudiced the defendant.  Here, Hale contends that counsel's failure to present mitigating evidence resulted from his failure to investigate possible sources of such evidence.  "[A]n attorney has a duty to conduct a reasonable investigation, including an investigation of the defendant's background, for possible mitigating evidence."  Brecheen, 41 F.3d at 1366.

> The duty to investigate derives from counsel's basic function, which is to make the adversarial testing process work in the particular case. Because that testing process generally will not function properly unless defense counsel has done some investigation into the

- 23 -

prosecution's case and into various defense strategies, the Supreme Court has noted that counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.

Stouffer v. Reynolds, 168 F.3d 1155, 1167 (10th Cir. 1999) (alterations in original omitted). This duty is strictly observed in capital cases. See Nguyen v. Reynolds, 131 F.3d 1340, 1347 (10th Cir. 1997). An attorney's failure to conduct a reasonable investigation "may fall outside the scope of reasonable professional assistance, and thereby amount to deficient representation under the first prong of Strickland." Brecheen, 41 F.3d at 1366 (quotation marks omitted).

To determine whether Van Wagner's performance was below the prevailing standards, we review the evidence presented at the state habeas evidentiary hearing. During the hearing, Van Wagner testified that he spent a considerable amount of time reviewing the law and the charges, conferencing with Hale, examining the FBI reports from the federal prosecution, talking with Hale's father and wife, and talking with other witnesses. Although Van Wagner testified that he spoke with various potential witnesses, he could not recall any person with whom he actually spoke other than Mr. Hale's father and wife. Moreover, Hale testified that he gave Van Wagner a list of friends that Van Wagner could contact about possibly testifying on Hale's behalf. Several people Hale named on this list testified at the hearing that they were never contacted before or during the trial, though they would have been willing to testify at trial on Hale's behalf. Although

- 24 -

Van Wagner testified that Hale was adamant that his wife and daughter not testify during the mitigation stage, this did not preclude him from investigating other potential witnesses or mitigating evidence. In addition, Van Wagner admitted that he did not hire an investigator to track down any potential mitigation witnesses. A defense investigator hired by Hale's state habeas counsel testified at the hearing that finding mitigation witnesses in this case was in fact easier than most death penalty cases because Hale had been a long-time resident of the area where the crime and trial took place. Thus, there were reasonable lines of investigation open to Van Wagner which would have revealed readily available mitigation witnesses; however, Van Wagner failed to pursue any of them.

Given this lack of investigation, Van Wagner's decision not to put forth any mitigation evidence at the sentencing phase cannot be justified as strategic. As this court stated in Breechen, before an attorney can insulate his behavior from review by claiming that a decision to forego mitigation evidence was strategic, "an attorney must have chosen not to present mitigating evidence after having investigated the defendant's background, and that choice must have been reasonable under the circumstances." Brecheen, 41 F.3d at 1369. In this case, Van Wagner testified that he "thought" one of the reasons he may have decided not to present any mitigation testimony was because Hale had several prior felony convictions which he feared would be brought out by the prosecution should he

put on character witnesses. However, none of the these prior felony convictions involved violent crimes. Moreover, the witnesses that testified on behalf of Hale at the post-conviction hearing stated that these prior convictions would not have influenced their opinion of Hale. If Van Wagner had spoken with these individuals he may have decided that the risks of revealing several prior, non-violent convictions were outweighed by the benefit to be obtained from the witnesses' testimony. In any event, Hale's criminal record could not justify a failure to investigate possible mitigating evidence even if it might be a justification not to introduce such evidence at trial. Because Van Wagner failed to make any investigation, we believe it was unreasonable for the OCCA to conclude that Van Wagner's decision to present no mitigating witnesses was a strategic decision. We conclude that Van Wagner functioned well below the level of any competent attorney during the penalty phase in failing to investigate mitigating evidence.

We must, however, still determine whether Hale has met his burden under AEDPA of showing that Van Wagner's deficient performance prejudiced him. In assessing prejudice in the penalty phase, "we must keep in mind the strength of the government's case and the aggravating factors the jury found as well as the mitigating factors that might have been presented" if Van Wagner's performance had not been deficient. Stafford v. Saffle, 34 F.3d 1557, 1564 (10th Cir. 1994).

During the state post-conviction evidentiary hearing, Hale presented the testimony of four family members and nine friends who all stated they would have testified at the sentencing phase if asked. Two of these witnesses, however, included Hale's wife and daughter. Hale had insisted at trial that his wife and daughter not be allowed to testify on his behalf, and affirmed this demand when he testified at the post-conviction hearing. As the client, Hale had the right to preclude this testimony. See Stafford, 34 F.3d at 1564-65 (recognizing client's right to preclude a line of defense). This left the potential testimony of two family members, Hale's sister and his uncle, and nine friends. Initially, we point out that it is unclear whether Hale's sister would have been able to testify on her brother's behalf. At the time of the trial, she was away in Italy and no one had informed her that her brother was on trial. In addition, four of the people who testified provided somewhat equivocal statements on behalf of Hale. For example, one friend stated that he liked Mr. Hale, but he was also friends with the victim's family, and stated only that Hale "seemed to care," or at least "I never saw anything that would indicate that he didn't." Another friend stated in response to the question "Would you have told the jury to ask them to spare his life?": "I don't know what I would have told them." Still another friend responding to the same question testified that he would have simply stated that he "knew him [Hale] socially to the extent that he and I talked together frequently

about baseball, and we were good friends. I–I didn't know anything other than that about him, really." The remainder of the testimony from other witnesses was limited to general statements that Hale was a good father and friend, a good citizen, and had been a good student back in high school.

Against these testimonials from friends and family members, some of which were equivocal, is the State's strong case against Hale. The jury found two aggravators: the murder was "heinous, atrocious, or cruel" and the murder was committed to avoid lawful arrest. There was ample evidence to prove both of these aggravators.[6] In addition, there was strong evidence connecting Hale to the crime. The victim was wrapped in Hale's trampoline tarp. The body was found at Hale's father's home and the gun used to kill the victim was a gun Hale had borrowed from his father. Furthermore, there was hair, blood, and fingerprint evidence connecting Hale to the murder. There was also evidence presented at trial that Hale had attempted to kidnap a woman just one day prior to the kidnapping of the victim, and a former cellmate of Hale's testified that Hale had told him he knew how to get rid of witnesses. The cellmate further stated that when Hale learned that the inmate was going to testify against him, the inmate was beaten up by Hale and others.

---

[6] See infra issues 12 & 13.

Given the strength of the case against Hale, the aggravating factors found by the jury, and the nature of the crime itself, we do not believe that the later-identified testimony from family and friends, some of which was equivocal and none of which was compelling, would have created a reasonable probability that the jury would have sentenced Hale to life in prison. See Boyd v. Ward, 179 F.3d 904, 918 (10th Cir. 1999) ("Even if we assume the failure to present mitigating evidence in the form of testimony from childhood acquaintances and family members is deficient performance," petitioner failed to establish prejudice in light of minimal other mitigating evidence and overall strength of state's case); Smith v. Gibson, 197 F.3d 454, 463-64 (10th Cir. 1999) (finding testimony from family, friends, bosses, and former coaches insufficient to show jury would have sentenced defendant to life in prison in light of "brutal and senseless nature of this crime and the strength of the State's evidence supporting the three aggravating circumstances"). Thus, we conclude the OCCA's determination that Hale's counsel was not ineffective was not an unreasonable application of federal law.

## C. Voir Dire

Hale next argues that his trial counsel rendered ineffective assistance of counsel during voir dire. Specifically, Hale argues that his trial attorney, Mr. Van

Wagner, was ineffective when he: (1) failed generally to question jurors about a possible defense strategy; (2) failed to attempt to rehabilitate jurors challenged for cause by the state based upon their views on the death penalty; and (3) failed to challenge for cause or use peremptory challenges to exclude several jurors with preconceived notions of Hale's guilt.

Hale raised this claim on direct appeal, and the OCCA summarily dismissed it, finding that defense counsel's conduct during voir dire was not deficient. Hale I, 750 P.2d at 139. The court further stated that "challenges to veniremen are a matter of trial technique which should not be second guessed with the benefit of hindsight." Id. As discussed above, to show ineffective assistance of counsel, Hale must show both constitutionally deficient performance by trial counsel and prejudice.

1. General Questioning During Voir Dire

Hale argues that Mr. Van Wagner was ineffective because he failed to educate the jury on any aspect of his second stage strategy. However, Hale has failed to demonstrate how Mr. Van Wagner's questioning during voir dire fell below constitutional standards.

In Nguyen v. Reynolds, 131 F.3d 1340 (10th Cir. 1997), this Court held that "[a]n attorney's actions during voir dire are considered to be matters of trial

strategy. A strategic decision cannot be the basis for a claim of ineffective assistance unless counsel's decision is shown to be so ill chosen that it permeates the entire trial with obvious unfairness." Id. at 1349 (citation omitted). Hale has failed to demonstrate that Mr. Van Wagner's failure to question jurors about a possible defense strategy permeated the trial with unfairness.

The Supreme Court has held that in a capital trial, due process requires a voir dire examination of a potential juror's views on the death penalty, see Morgan v. Illinois, 504 U.S. 719, 729, 112 S. Ct. 2222, 119 L. Ed. 2d 492 (1992); however, it is clear from the transcript of the voir dire proceedings that such an examination did take place in this case. Furthermore, after examining the transcript, it is clear that Mr. Van Wagner did ask the jurors questions that attempted to elicit potential biases which could be either helpful or damaging to Hale's case. These questions included whether the jurors held an opinion, whether they knew anyone in law enforcement that would color their ability to be impartial, and whether they were members of a church. Moreover, the court thoroughly questioned the jurors as to their views on the death penalty. Thus, Hale has failed to show that Mr. Van Wagner's performance in questioning the jurors during voir dire was constitutionally deficient or prejudicial.


2. Rehabilitation of Jurors Challenged for Cause

- 31 -

Hale next argues that trial counsel was ineffective because he failed to attempt to rehabilitate four jurors after the state challenged them for cause and the court dismissed them based upon their views regarding the death penalty.

The trial court asked the following question of all the jurors: "If selected as a juror in a case where the law and the evidence warrant could you without doing violence to your conscious [sic] recommend the death penalty?" The trial judge then went on to question individually those jurors who responded negatively about their views on the death penalty. These jurors included Jurors Fischer, Zinn, Abel, and Myer. In individual questioning, three of these jurors, Fischer, Zinn, and Meyer, stated unequivocally that they could not inflict the death penalty in any case. The fourth juror, Abel, stated that she could not apply the death penalty in this case regardless of the evidence because she knew Hale, his daughter, and his wife. These responses were repeated upon questioning by the state.

The Supreme Court in Wainwright v. Witt, 469 U.S. 412, 105 S. Ct. 844, 83 L. Ed. 2d 841 (1985), articulated the standard for determining whether a prospective juror must be excluded for cause because of his or her view on capital punishment as "whether the juror's views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and

his oath." Id. at 424 (quotation marks omitted). A juror's bias need not be proven

with "unmistakable clarity" because

> determinations of juror bias cannot be reduced to question-and-answer sessions which obtain results in the manner of a catechism. . . . Despite this lack of clarity in the printed record, however, there will be situations where the trial judge is left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law. . . . [T]his is why deference must be paid to the trial judge who sees and hears the juror.

Id. at 424-26.

Thus, the state trial judge's determination is statutorily accorded a

presumption of correctness which can only be rebutted by clear and convincing

evidence. See 28 U.S.C. 2254(e)(1); see also Williams v. Collins, 16 F.3d 626,

633 (5th Cir. 1994). A review of the responses of the four jurors in this case

indicates that the trial court did not improperly excuse them under Wainwright.

All four jurors in question in this case made it clear, by the time both the trial

judge and the prosecutor finished asking questions, that they could not impose the

death penalty in this case regardless of the evidence or the facts presented. Based

on their answers, the trial court could have been "left with the definite impression

that [Fischer, Abel, Meyer, and Zinn] would be unable to faithfully and

impartially apply the law." See Wainwright, 469 U.S. at 426. Hale has produced

no evidence to rebut the trial court's finding that the jurors should be removed for

cause, and he has advanced no evidence to suggest that further cross-examination

of these witnesses would have been helpful. Hence, we cannot find that Hale's counsel acted unreasonably or unprofessionally in failing to attempt to rehabilitate the four dismissed jurors. See Williams, 16 F.3d at 633 (holding that counsel was not ineffective for failing to rehabilitate three jurors excused for cause when their answers suggested they would not have been able to function properly as jurors in a capital case); Foster v. Delo, 39 F.3d 873, 878 (8th Cir. 1994) (finding counsel was not ineffective for failing to rehabilitate two jurors excused for cause when they answered unequivocally that they could not consider the death penalty regardless of the law or the evidence); see also Sawyer v. Butler, 848 F.2d 582, 589 (5th Cir. 1988) (denying an ineffective assistance claim and holding that there was no prejudice from counsel's failure to rehabilitate prospective jurors who stated they could not impose the death penalty when defendant failed to demonstrate rehabilitation was possible), aff'd on reh'g, 881 F.2d 1273 (5th Cir. 1989), aff'd sub nom. Sawyer v. Smith, 497 U.S. 227, 110 S. Ct. 2822, 111 L. Ed. 2d 193 (1990).

3. Failure to Challenge Jurors With Preconceived Notions of Guilt

Hale's next argument is that his trial counsel was ineffective when he did not challenge for cause or excuse by peremptory challenge six jurors who had preconceived notions of Hale's guilt. As support for this claim, Hale presents the

testimony of Judge Frank McCarthy who testified as an expert witness during the post-conviction evidentiary hearing. Judge McCarthy opined that

> in a case where the defense knows going in that they're not going to offer any substantive testimony, and they know that they've got a good venue issue, to allow six jurors to sit on your jury, who say they've already got their minds made up or have opinions about your client's guilt, is just inappropriate and it's ineffectively representing your client. There's no reason for you to do that.

As noted above, in order to show counsel was ineffective for failing to object to the presence of certain persons on the jury, Hale must prove "counsel's representation fell below an <u>objective</u> standard of reasonableness." <u>Kimmelman v. Morrison</u>, 477 U.S. 365, 375, 106 S. Ct. 2574, 91 L. Ed. 2d 305 (1986) (emphasis added). In addition, Hale must show counsel's deficient performance prejudiced the defense. "This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." <u>Strickland</u>, 466 U.S. at 687. Defense counsel's failure to attempt to remove from the jury a person who has been established on voir dire to be biased constitutes prejudice under <u>Strickland</u>. <u>See</u> <u>Johnson v. Armontrout</u>, 961 F.2d 748, 755-56 (8th Cir. 1992). To show a juror was biased, a defendant must show that the juror had such a fixed opinion that he or she could not judge impartially. <u>See</u> <u>Patton v. Yount</u>, 467 U.S. 1025, 1035, 104 S. Ct. 2885, 81 L. Ed. 2d 847 (1984). Thus, a juror is not shown to have been impartial simply because he or she had a preconceived notion as to the guilt or innocence of the accused. <u>See</u> <u>Murphy v.</u>

Florida, 421 U.S. 794, 800, 95 S. Ct. 2031, 44 L. Ed. 2d 589 (1975).  The

Supreme Court stated in Irwin v. Dowd, 366 U.S. 717, 81 S. Ct. 1639, 6 L. Ed. 2d

751 (1961):

> It is not required . . . that the jurors be totally ignorant of the facts
> and issues involved. . . .To hold that the mere existence of any
> preconceived notion as to the guilt or innocence of an accused,
> without more, is sufficient to rebut the presumption of a prospective
> juror's impartiality would be to establish an impossible standard.  It
> is sufficient if the juror can lay aside his impression or opinion and
> render a verdict based on the evidence presented in court.

Id. at 722-23.  Thus, to show a juror was biased, Hale must show more than that

the juror had a preconceived notion of guilt; he must show that the juror had such

a fixed opinion that he or she could not judge impartially.

In this case, Hale contends that counsel was deficient when he did not

attempt to remove six jurors whom he claims held opinions as to his guilt, and

that this failure prejudiced him because he was convicted by an impartial jury.

However, these jurors implicitly or explicitly all said that they held only mild or

slight opinions and all six said they could put their opinions aside and judge the

case impartially on the evidence.

One of these jurors, Juror McBee, was a member of the Oklahoma State

Bureau of Investigation Commission ("OSBIC").  The OSBIC had been involved

in the investigation of Hale's case; however, there was no suggestion in the voir

dire transcript that Juror McBee had actually participated in the investigation.  On

the other hand, there was testimony during voir dire that Juror McBee was a friend of Hale's counsel, Mr. Van Wagner, and knew the defendant and the defendant's family socially. In fact, Juror McBee stated during voir dire that he had played golf with Hale on multiple occasions. Thus, it was objectively reasonable for Van Wagner to have left McBee on the jury under the belief that he would be favorable to the defendant, both because he was a friend of counsel and because he knew Hale and his family socially.

Another of these jurors, Juror McLaughlin, also stated during voir dire that he knew Hale. McLaughlin stated that he had done business with Hale and would see him at Hale's bakery where they would strike up conversations. Based on this testimony, it was reasonable trial strategy to have left this person on the jury in the hope that he would be favorable to Hale, or at the very least be reluctant to give him the death penalty.

The judge asked the entire jury panel twice whether anyone felt they could not give both sides a fair and impartial trial and no one responded. Further, Hale never showed actual bias by any of these seated jurors. Cf. Smith v. Phillips, 455 U.S. 209, 215, 102 S. Ct. 940, 71 L. Ed. 2d 78 (1982); Irons. v. Lockhart, 741 F.2d 207; 208 (8th Cir. 1984).

This situation is in stark contrast to Johnson v. Armontrout, 961 F.2d 748 (8th Cir. 1992), in which the court found ineffective assistance of counsel when

the defense attorney failed to remove two biased jurors for cause. In Johnson, ten members of Mr. Johnson's venire had previously served on a jury who had earlier convicted another man of taking part in the same robbery. Mr. Johnson had appeared at the earlier trial handcuffed and under guard. Id. at 751. The court found actual prejudice because two of those ten jurors stated unequivocally that they firmly believed that Johnson was guilty of the robbery. Id. The court found that the failure to remove two biased jurors constituted actual prejudice. Id. at 755-56. In contrast, here there was no unequivocal statement by any juror that they were firmly convinced Hale was guilty and could not set aside this opinion. On the record before us, we conclude that Hale has not established a Strickland violation because his counsel failed to challenge these jurors.

**D. Admission of Other Crimes Evidence.**

Hale next argues that his trial counsel was ineffective when he failed to object to the admission of evidence of other crimes allegedly committed by Hale. The other crimes evidence to which Hale argues counsel should have objected included Mrs. Brenda Allison's testimony that Hale, on the day before Jeff Perry was abducted, drove up to Mrs. Allison's home, informed her that her husband had been in an auto accident, and offered to drive her to the hospital. Mrs. Allison later learned that her husband was never in a car accident. The Prosecutor argued that this evidence was admitted to show identity, motive, plan,

and intent on the part of Hale. Hale also claims that counsel should have objected to the admission of the testimony of one of Hale's former cellmates, Mark Weaver, who testified that Hale and other inmate beat him after he agreed to testify against Hale.[7]

The Oklahoma Court of Criminal Appeals addressed this claim as part of Hale's ineffective assistance of counsel claim on direct appeal. In rejecting the claim, the court held:

> We find that the other crimes evidence which consisted of a possible attempted kidnapping and an assault on a prison cellmate who gave testimony on behalf of the State was admissible to show common scheme and identity. As the evidence was properly admissible, we find that there was no deficiency in failing to raise an objection to it.

Hale I, 750 P.2d at 140.

Hale's claim can be resolved by addressing the prejudice prong under Strickland. Hale has failed to demonstrate that if trial counsel had objected to the admission of the above testimony, it would have been excluded.

The OCCA has repeatedly allowed the admission of evidence of other crimes to prove motive, common scheme, identity, plan, knowledge, or absence of

---

[7] Weaver testified that while he was a cellmate of Hale's, Hale told him he knew how to get rid of witnesses. After Hale learned that Weaver was going to testify about this statement, Hale and several other inmates beat up Weaver. On habeas, Hale does not argue that his attorney should have objected to Weaver's testimony that Hale told him he knew how to get rid of witnesses. He only argues counsel should have objected to the testimony that Hale beat him up when he learned Weaver was going to testify against him.

mistake or accident. See, e.g., Huskey v. State, 989 P.2d 1, 3 (Okla. Crim. App. 1999); Douglas v. State, 951 P.2d 651, 673 (Okla. Crim. App. 1997). In this case, there was a question of identity. Hale denied that he was the one who kidnapped and killed Jeff Perry. He argued that he was simply told to pick up the money. The evidence by Brenda Allison of an attempted kidnapping just a day prior to the victim's abduction helped to establish identity and common scheme. The testimony by Mark Weaver that Hale beat him up when he discovered that Weaver was going to testify against him has been found by the OCCA to be admissible as other crimes evidence "to infer a consciousness of guilt from an attempt to improperly influence or cause the absence of a material witness at trial." Powell v. State, 995 P.2d 510, 527 (Okla. Crim. App. 2000). The OCCA has further stated that this type of evidence "constitute[s] 'admissions by conduct designed to obstruct justice' and [is] thus admissible to establish motive." Id. (quoting Gideon v. State, 721 P.2d 1336, 1338 (Okla. Crim. App. 1986)). Thus, the testimony of both witnesses was properly admissible as other crimes evidence. Hale has failed therefore to show that if his attorney had objected, the evidence would have been excluded.

Hale attempts to show prejudice by asserting that the prosecutor failed to give notice that he was introducing other crimes evidence as required under Oklahoma law. See Burks v. State, 594 P.2d 771, 774 (Okla. Crim. App. 1979)

- 40 -

(requiring notice of other crimes evidence ten days prior to trial), overruled in part on other grounds by Jones v. State, 772 P.2d 922, 925 (Okla. Crim. App. 1989).  Hale argues that if counsel had objected to the admission on the basis of insufficient notice, Oklahoma would have excluded the evidence.  Again, we disagree and therefore find no prejudice.

First, Hale has failed to support this assertion in his brief.  Although Hale had a full evidentiary hearing during post-conviction, he never asked Mr. Van Wagner, his attorney, whether he received notice; therefore there is no conclusive evidence that he did not receive notice.  In addition, in Malicoat v. State, 992 P.2d 383 (Okla. Crim. App. 2000), the OCCA clarified that failure to provide Burks notice does not automatically require the exclusion of other crimes evidence.  The court emphasized that the purpose of Burks notice is to ensure that the defendant is not surprised by the admission of other crimes evidence, and to allow the defendant time to be heard on the other crimes evidence before it is presented to the jury.  Malicoat, 992 P.2d at 402-03; see also Powell, 995 P.2d at 527 (no abuse of discretion on part of trial court in admitting other crimes evidence without Burks notice when defendant not surprised); Bryan v. State, 935 P.2d 338, 357 (Okla. Crim. App. 1997).

Hale cannot argue here that he was surprised by the testimony of either Brenda Allison or Mark Weaver.  Brenda Allison testified at the preliminary

- 41 -

hearing, thus providing counsel notice of the testimony she had to offer. In addition, her name was listed as a witness that would be called at trial. Moreover, Hale's trial counsel filed a motion in limine prior to trial attempting to suppress the evidence of Brenda Allison that was later denied by the trial court prior to trial. Mark Weaver testified at the preliminary hearing about Hale's assault on him. Moreover, Weaver was included on the list of trial witnesses. Therefore, even if Van Wagner had objected to the evidence at trial, the lack of written notice would not have kept the evidence out. Moreover, as discussed above, because the evidence was proper other crimes evidence, it would not have been excluded. Thus, Hale cannot show prejudice. We therefore find that the OCCA's determination that Hale was not denied effective assistance of counsel was not an unreasonable application of federal law.

**E. Second Stage Closing Remarks**

Mr. Hale next asserts that he received ineffective assistance of trial counsel during his counsel's second stage closing remarks. Specifically, Hale contends that his attorney's false statement to the jury that Hale had been abandoned by his wife and daughter constituted deficient performance that prejudiced his case. The OCCA concluded that under Strickland, Hale had not been denied his Sixth Amendment right to effective assistance of counsel. See Hale I, 750 P.2d at 142.

The portion of trial counsel's closing argument to which Hale objects reads as follows:

> And his wife Susan was here to testify earlier this week. She's abandoned him. He has a teenage daughter Jamie. She hasn't been here. She won't be here. I know it's easy to say that because of his participation he's earned it. I'm just asking you for mercy because you are better.

On this point, Hale fails to overcome the presumption that these statements "might be considered sound trial strategy." Strickland, 466 U.S. at 689. First, it is not clear whether the statement that Hale's wife had abandoned him at the time of trial was false. Hale's ex-wife testified during a post-conviction hearing that she began divorce proceedings approximately six or seven months "after this all happened." Second, it is undisputed that Hale had instructed his attorney that he did not want his wife or child to testify in his favor, in order to spare them any undue trauma. Therefore, it seems clear that in closing argument counsel was attempting to put the best spin on the fact that Hale's wife and daughter had not testified during the punishment phase, by attempting to garner sympathy. "For counsel's decision to rise to the level of constitutional ineffectiveness, the decision must have been completely unreasonable, not merely wrong, so that it bears no relationship to a possible defense strategy." See Hoxsie v. Kerby, 108 F.3d 1239, 1246 (10th Cir. 1997) (alterations and quotation marks omitted). Here, the attorney's comments had a reasonable relationship to a defense strategy.

Moreover, even if counsel was deficient in making this statement, Hale has failed to show any prejudice. There is no "reasonable probability that, but for counsel's [abandonment argument], the result of the proceeding would have been different." Strickland, 466 U.S. at 694. Thus, we find that the OCCA's determination that counsel was not ineffective was not an unreasonable application of federal law.

## F. First Stage Closing Statement

Hale next argues that during closing argument in the guilt phase of the trial, his attorney conceded his guilt and thus denied him effective assistance of counsel. The OCCA rejected this claim, finding no prejudice. Hale I, 750 P.2d at 142. The court further concluded that if counsel had claimed that Hale had not been involved at all, in the face of overwhelming evidence of Hale's involvement, counsel would have lost all credibility with the jury. Id.

The relevant portion of counsel's argument is as follows:

> This is the FBI's case. And after all they're the best in the country. At least that's what they tell us. And they look pretty sharp. Couple of the experts even spelled their names for you so you wouldn't miss out to know that. They're slick. The State would have you accept the FBI's case without any questions. Don't delve into hypotheticals says the State. Don't bother yourself with unanswered questions because we have answered everything that you could want to know. That's not true. There are a lot of unanswered questions, and you should ask every reasonable question that comes to your mind when you are in that jury room. . . .There isn't any

- 44 -

> doubt that Jim Hale was involved in this. No doubt whatsoever. How much though? To what extent? And was he the only one? How many voices were on the tapes? Susan Hale, Jim's wife, was able to say, "I can only identify my husband as on one of those tapes." What did it sound like to you?

We conclude that the OCCA reasonably applied <u>Strickland</u> in resolving this issue. Although "an attorney who adopts and acts upon a belief that his client should be convicted 'fail[s] to function in any meaningful sense as the Government's adversary,'" <u>Osborn v. Shillinger</u>, 861 F.2d 612, 625 (10th Cir. 1988) (quoting <u>United States v. Cronic</u>, 466 U.S. 648, 666, 104 S. Ct. 2039, 80 L. Ed. 2d. 657 (1984) (alteration in original)), Hale's counsel did not act in such a manner in this case. Instead, he made a reasonable strategic decision to concede some involvement by Hale, given the overwhelming evidence presented at trial, and focused on the extent of his involvement and whether others could have been involved. <u>See</u> <u>Trice v. Ward</u>, 196 F.3d 1151, 1161-62 (10th Cir. 1999) (finding it was neither unreasonable nor prejudicial to admit some involvement and focus energy on other arguments, when evidence was overwhelming).

Moreover, given the overwhelming evidence linking Hale to the crime–i.e., F.B.I. identification of Hale as the man making at least some of the ransom calls to Mrs. Perry; hair, gun, and blood evidence linking Hale to the crime; the body wrapped in a trampoline tarp which fit Hale's trampoline; and other eyewitness accounts of Hale's involvement–Hale cannot show a reasonable probability that

the outcome of the guilt phase of the trial would have been different absent the concession made by his attorney during closing argument.

## G. Improper Jury Instruction

Hale next argues that he is entitled to habeas relief because his jury was improperly instructed under Oklahoma law that the death penalty could be imposed for the kidnapping for extortion conviction. Hale presents this claim as both a constitutional claim and as a separate ineffective assistance of counsel claim. The OCCA addressed and rejected this claim on direct appeal, finding that although the instruction on the kidnapping charge incorrectly stated under Oklahoma law that kidnapping was a death-eligible offense, the error was not due to any willful misconduct on the part of the attorney or the trial court. Moreover the court stated that "[s]ince the jury in this case did not assess the death penalty for the extortion conviction, appellant has not demonstrated prejudice resulting from the improper instruction." Hale I, 750 P.2d at 138 (citing Bumper v. North Carolina, 391 U.S. 543, 545, 88 S. Ct. 1788, 20 L. Ed. 2d 797 (1968)). The OCCA further concluded that counsel was not deficient for his failure to object to the jury instruction. Id. at 142.

It is not disputed that the second stage jury instruction regarding the possible punishment for kidnapping was in error, because it stated that Hale could be given the death penalty on the kidnapping charge. The instruction read:

> The Defendant in this case has been found guilty by you, the jury, of the offense of KIDNAPPING FOR EXTORTION as charged in count II of the information. It is now your duty to determine the penalty to be imposed for this offense.
> Under the law of the State of Oklahoma, every person found guilty of KIDNAPPING FOR EXTORTION shall be punished by death or imprisonment in the penitentiary, not less than ten (10) years.

In addition to the above instruction, the prosecutor argued during his second stage closing argument that both counts–murder and kidnapping–carried the death penalty and urged its imposition on both counts. The prosecutor also stated, however, that if the jury rejected the death penalty, the jury could give Hale life or "any range you want."

Hale first argues that the kidnapping instruction that allowed for the imposition of a death sentence resulted in constitutional error that cannot be viewed as harmless. The Supreme Court has stated that the argument that a jury instruction is incorrect under state law is not a basis for federal habeas relief. See Estelle v. McGuire, 502 U.S. 62, 71-72, 112 S. Ct. 475, 116 L. Ed. 2d 385 (1991); Esquibel v. Rice, 13 F.3d 1430, 1433 (10th Cir. 1994). The appropriate question on habeas review is "whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process." McGuire, 502 U.S. at 72.

- 47 -

The instruction must be viewed in the context of the instructions as a whole and the trial record.  Id.  For this review, we apply a harmless error analysis.  See California v. Roy, 519 U.S. 2, 5, 117 S. Ct. 337, 136 L. Ed. 2d 266 (1996) (reviewing jury instruction under harmless error analysis).

Prior to AEDPA, federal courts applied the Brecht v. Abrahamson, 507 U.S. 619, 637, 113 S. Ct. 1710, 123 L. Ed. 2d 353 (1993), harmless error analysis.  Under Brecht, a federal court on habeas review must determine whether the error had a "substantial and injurious effect or influence in determining the jury's verdict."  Id. at 623.  AEDPA now provides, however, that habeas relief shall not be granted from state convictions "unless the adjudication of the claim . . . involved an unreasonable application of [] clearly established Federal law, as determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d).  Chapman v. California, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967), sets forth the clearly established standard that state courts apply for evaluating instances of constitutional error–whether an error was harmless beyond a reasonable doubt.  Oklahoma Court of Criminal Appeals reviewed this error for prejudice, citing Bumper v. North Carolina, 391 U.S. 543, 545 (1968).  That, however, is the wrong constitutional standard.  Bumper v. North Carolina, id., refers only to whether a Witherspoon challenge (Witherspoon v. Illinois, 391 U.S. 510, 88 S. Ct. 1770, 20 L. Ed. 2d 776 (1968)) can be applied to a case where the

jury recommends life imprisonment rather than death. Thus, we find that case inapposite. The proper harmless error standard, that should have been applied, is that expressed in Chapman v. California. Thus, we apply the standard of review set forth in Brecht. See Williams v. Taylor, 120 S. Ct. 1495 (2000).

Here, the jury recommended a life sentence, not death for the kidnapping conviction. The jury was given a full range of possible sentences and chose a permissible sentence under Oklahoma law–life in prison. There is no evidence that the jury was influenced to give a life sentence simply because they were given the impermissible choice of giving a death sentence.

Moreover, there is no evidence that the jury imposed the death sentence for the murder conviction because of the erroneous kidnapping instruction. Hale attempts to show that the jury imposed a death sentence on the murder charge because of the erroneous kidnapping charge by suggesting that the jury impermissibly double-counted aggravators. Hale asserts that because the jury found the "heinous, atrocious, or cruel" aggravator for the kidnapping charge and also found the "heinous, atrocious, or cruel" aggravator for the murder charge, the jury was allowed to double-count. Hale misconstrues double counting. Double-counting occurs when one aggravating circumstance for a crime found by the jury necessarily subsumes another aggravator found by the jury for the same crime. See Smith v. Gibson, 197 F.3d 454, 464 (10th Cir. 1999). Here, the jury looked

at a similar aggravator for two separate crimes.  There is no evidence that the jury relied on the aggravating circumstances it found arising from the kidnapping in assessing the penalty for the murder charge.  Moreover, such an assumption would ignore the jury instructions, which the jury is presumed to follow, see Shannon v. United States, 512 U.S. 573, 585, 114 S. Ct. 2419, L. Ed. 2d 459 (1994), that provided the jury with separate aggravating circumstances for each crime.  Thus, Hale's argument that double counting allowed the jury to use the erroneous kidnapping charge to assess death for the murder charge fails.  We therefore conclude that any constitutional error in the instruction did not have a substantial and injurious effect on the jury.

Hale further argues that he was denied effective assistance of counsel due to his counsel's failure to object to the improper jury instruction on the kidnapping charge.  Even if we were to assume that this constituted deficient performance, Hale has failed to show prejudice.  Hale has not shown that had counsel objected, there is a reasonable probability that the jury would have returned a sentence other than life in prison.  The jury's actual sentence did not reflect an error of law.  Cf. Kennedy v. Maggio, 725 F.2d 269 (5th Cir. 1984) (finding counsel ineffective when it counseled client to plead guilty to rape under erroneous belief that if defendant went to trial he would be eligible for the death penalty).  Here, the jury was allowed under the law to return a sentence of life

imprisonment. Mere speculation that the jury might have returned a lesser prison sentence if death had not been a possibility is not sufficient to show prejudice. Thus, Hale has not established that the OCCA's determination that counsel was not ineffective was unreasonable.

**H. Amended Bill of Particulars**

Hale next argues that his due process rights were violated when the State waited until the first day of trial to file an amended Bill of Particulars which added the "avoiding arrest" aggravating circumstance to the three already alleged in the original Bill of Particulars.[8] Hale also argues that his counsel's failure to object to this addition resulted in ineffective assistance of counsel.

1. Due Process

The OCCA rejected this claim, finding that it bordered on the "frivolous." See Hale I, 750 P.2d at 139. The court went on to state that at the time the Bill of Particulars was amended, Hale was "already aware of all of the evidence to be

---

[8] The original Bill of Particulars alleged three aggravating circumstances: (1) The defendant committed the murder for remuneration or the promise of remuneration. (2) The murder was especially heinous, atrocious, and cruel. (3) There exists the probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society.

- 51 -

used by the State to prove [the aggravator];" thus defense counsel was not surprised. Id.

The Supreme Court has held that the Due Process Clause requires that a defendant receive adequate notice that he could receive the death penalty. Lankford v. Idaho, 500 U.S. 110, 127, 111 S. Ct. 1723, 114 L. Ed. 2d 173 (1991). In addition, "a defendant must have a meaningful opportunity to deny or explain the State's evidence used to procure a death sentence." Duvall v. Reynolds, 139 F.3d 768, 797 (10th Cir. 1998) (citing Gardner v. Florida, 430 U.S. 349, 362, 97 S. Ct. 1197, 51 L. Ed. 2d 393 (1977)).

In this case, Hale argues that the amendment to the Bill of Particulars on the day of trial, February 27, 1984, deprived him of due process. However, Hale knew from the prior Bill of Particulars that he was subject to the death penalty on the basis of three aggravators. In addition, the State had previously submitted its list of witnesses and did not include any new witnesses when it added the new aggravator, nor did it add any witnesses in the punishment phase. Hale was aware of all of the evidence and witnesses that were going to be presented against him at trial and in the punishment phase prior to the addition of the "avoid arrest" aggravator. Moreover, Hale's counsel announced that he was ready on the first day of trial, and testified at the state post-conviction hearing that he was not surprised by any evidence presented at trial and was ready when the trial began.

Thus, Hale was not subjected to "trial by ambush." See Duvall, 139 F.3d at 797.

Therefore, Hale has not carried his burden of showing that the OCCA's

determination that there was no error was an unreasonable application of federal

law.

2. Ineffective Assistance of Counsel

Hale further argues that under Oklahoma law, if Hale's trial counsel had

objected to the addition of the "avoid arrest" aggravator on the morning of the

first day of trial, the court would have excluded it. Because the jury found the

"avoiding arrest" aggravator when it reached its decision to impose the death

penalty, Hale argues that he suffered prejudice from the failure to object and have

the aggravator quashed. The OCCA addressed and rejected this claim, finding

that the trial court properly could have admitted the additional aggravator under

Oklahoma law, and thus trial counsel was not deficient. See Hale I, 750 P.2d at

141.

At the time Hale was tried, Oklahoma had no set time by which the State

had to have filed a Bill of Particulars. See Hunter v. State, 829 P.2d 64, 65

(Okla. Crim. App. 1992).[9] Oklahoma courts, however, required that the Bill of

_____

[9] In Hunter, the OCCA announced a new rule of procedure requiring the
State to file the Bill of Particulars prior to or at the time of arraignment. Hunter,
(continued...)

Particulars be filed within a reasonable amount of time so that the defense could prepare for trial. See id.; Carpenter v. State, 929 P.2d 988, 994-95 (Okla. Crim. App. 1996). In this case, Hale was not surprised by the fact that the State was seeking the death penalty when the State introduced a fourth aggravator the day of trial, because an original Bill of Particulars had already been filed. In addition, as noted above, Hale was aware of all of the evidence and witnesses that the state was going to use against him prior to the amendment and had time to prepare a defense.[10]

Because Hale was not surprised by any new evidence or witnesses, or by the fact that the State was seeking the death penalty, and no new evidence was introduced at the sentencing phase, the trial court would not have been required to quash the additional aggravator even if counsel had objected. Hale has failed to show that he was prejudiced under Strickland. Therefore, we cannot find that the

---

[9] (...continued)
829 P.2d at 65. However, in Thomas v. State, 888 P.2d 522, 527 (Okla. Crim. App. 1994), the OCCA clarified that Hunter does not apply retroactively to cases that are on collateral review at the time the rule was laid down. Because the rule in Hunter was announced after Hale's direct appeals were completed, the rule does not apply in his case.

[10] The OCCA found that the amendment to the Bill of Particulars was made prior to the commencement of trial. See Hale I, 750 P.2d at 140. This is a factual finding that is presumed to be correct, absent clear and convincing evidence to the contrary. Our review of the record indicates that the amendment was filed prior to the start of trial and was addressed by the court with the parties prior to the beginning of any proceedings in the trial.

OCCA's determination that counsel was not ineffective was an unreasonable application of federal law.

## II. Double Jeopardy and Liberty Interest

Hale next argues that his constitutional rights were violated when the State of Oklahoma prosecuted him for first-degree murder and kidnapping for purposes of extortion following his conviction in federal court for extortion under the Hobbs Act, 18 U.S.C. § 1951. Specifically, Hale argues the state prosecutions were barred by Okla. Stat. tit. 21, § 25 (repealed 1986), and that Oklahoma's failure to enforce that statute amounted to a deprivation of his liberty interest.[11] Appellee contends that Hale failed to exhaust this claim fully with regard to the murder conviction and thus habeas relief should be denied pursuant to 28 U.S.C. § 2254(b)(1).

On direct appeal Hale argued (1) that he could not be tried for the crime of kidnapping under the Oklahoma Constitution, because he had already been convicted of extortion in federal court under the Hobbs Act, and (2) that the state prosecutions for kidnapping and first degree murder violated the Oklahoma

---

[11] Hale does not argue, nor could he, that the federal prosecution and state prosecutions violated the Double Jeopardy clause of the Fifth Amendment. See Abbate v. United States, 359 U.S. 187, 79 S. Ct. 666, 3 L. Ed. 2d 729 (1959) (holding that prior state conviction did not bar subsequent federal prosecution under the Double Jeopardy Clause).

Double Jeopardy Clause.  Thus, Hale did not raise a federal constitutional claim on direct appeal.  In Hale's second application for post-conviction relief, Hale did raise a  federal constitutional claim; however, the claim raised in the second application challenged only the kidnapping conviction and did not challenge the murder conviction.  The OCCA did not address this claim on post-conviction review finding that it had been raised on direct appeal and was therefore barred.  See Hale III, 934 P.2d at 1102.  Thus, the issue as it concerns the murder charge has not been exhausted.[12]  See Anderson v. Harless, 459 U.S. 4, 6-7, 103 S. Ct. 276, 74 L. Ed. 2d 3 (1982) (per curiam) (petitioner failed fairly to present federal habeas claim to state courts where, in state court proceedings, he relied only upon state law authority to challenge jury instruction).

> Nevertheless, the Supreme Court has held that if a petitioner 'failed to exhaust state remedies and the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred' the claims are considered exhausted and procedurally defaulted for purposes of habeas relief.

---

[12]  Hale seems to argue in the reply brief that the Appellee has waived the exhaustion argument because it did not raise it before the district court.  This argument fails under 28 U.S.C. § 2254(b)(3), which states, "A State shall not be deemed to have waived the exhaustion requirement or be estopped from reliance upon the requirement unless the State, through counsel, expressly waives the requirement." The record does not reveal that Appellee has ever expressly waived the exhaustion requirement on this claim; thus it is free to raise this issue on appeal to this court.

Thomas v. Gibson, No. 99-5030, 2000 WL 986587, at *5 (10th Cir. July 18, 2000) (quoting Coleman v. Thompson, 501 U.S. 722, 735 n.1, 111 S. Ct. 2546, 115 L. Ed. 2d. 640 (1991)). Oklahoma bars collateral review of claims actually raised on direct appeal or those that could have been raised on direct appeal but were not. See Brecheen, 41 F.3d at 1349 n.4 (citing Okla. Stat. tit. 22, § 1086). Accordingly, Hale has defaulted his claim with regard to the murder conviction.

We cannot consider issues raised in a habeas petition "that have been defaulted in a state court on an independent and adequate procedural ground unless the petitioner can demonstrate cause and prejudice or a fundamental miscarriage of justice." Thomas, 2000 WL 986587, at *6 (alteration omitted). This court has held that Oklahoma's procedural bar to most claims not raised on direct appeal (other than ineffective counsel claims) is independent and adequate. See Brecheen, 41 F.3d at 1356. Because Hale has not shown cause and prejudice or that a fundamental miscarriage of justice will occur if we do not address the claim with regard to the murder conviction, this part of his claim is barred.

Although Hale also failed to raise his federal claim with regard to the kidnapping conviction on direct appeal, and thus it would seem this part of the claim is also procedurally barred, Appellee has not raised procedural bar with respect to this aspect of Hale's claim. As such, we will consider Hale's kidnapping claim on the merits, see Hooks, 184 F.3d at 1223 (proceeding to

- 57 -

merits of claim when state did not raise procedural bar), as did the federal district court, which denied the claim and found that even if section 25 creates a liberty interest, Oklahoma would not find that Hale was entitled to have the state charges dismissed under that statute. Because, as noted above, the Oklahoma courts never addressed Hale's claim that Okla. Stat. tit. 21, § 25 created a federally protected liberty interest preventing the state prosecution of Hale for kidnapping, the claim was not "adjudicated on the merits in State court proceedings," as contemplated by 28 U.S.C. § 2254(d). Thus, we must review the claim under pre-AEDPA standards. Prior to AEDPA we reviewed questions of law on habeas de novo. Hooks, 184 F.3d at 1223.

"Whether an interest created by state law rises to the level of a 'liberty interest' protected by the Due Process Clause of the Fourteenth Amendment is a matter of federal law." Montero v. Meyer, 13 F.3d 1444, 1447 (10th Cir. 1994). It is unnecessary for this court to determine whether section 25 creates a liberty interest cognizable under the United States Constitution, because whether it does or not, Oklahoma would not find that Hale's claim falls within the scope of section 25.

Section 25 states:

Whenever it appears upon the trial that the accused has already been acquitted or convicted upon any criminal prosecution under the laws of another state, government or country, founded upon the act or

- 58 -

omission in respect to which he is upon trial, this is a sufficient defense.

Russell v. State, 654 P.2d 1058, 1061 (Okla. Crim. App. 1982) (quoting Okla. Stat. tit. 21, 21 O.S. § 25). Hale's conviction in federal court under the Hobbs Act constituted a conviction under the laws of another government for purposes of section 25. See Russell, 654 P.2d at 1061. Under the decisions of Oklahoma courts addressing the interpretation of this statute, the question then becomes "whether the federal and subsequent State prosecutions were founded upon the same offense or 'acts' as provided in the statute." Id.[13] To make this determination, the Oklahoma courts look to the language of the different statutes

---

[13] Hale argues in his brief that this court has already held that the state and federal convictions in this case are based on the same acts and thus, under the "law of the case" doctrine, we are bound. Hale cites to this court's opinion in Hale v. United States Department of Justice, 99 F.3d 1025 (10th Cir. 1996). In that case, this court stated "[i]n 1983 Hale was convicted in the United States District Court for the Western District of Oklahoma under the Hobbs Act, 18 U.S.C. § 1951, for his action in connection with the kidnapping and murder of William Jeffrey Perry. Hale was sentenced to twenty years imprisonment. The following year, Hale was convicted and sentenced to death by the State of Oklahoma for his role in the same crime." Id. at 1027-28 (citations omitted). Hale misconstrues the "law of the case" doctrine. As explained in Jeffries v. Wood, 114 F.3d 1484 (9th Cir. 1997), the law of the case is a doctrine under which an appellate court will not reconsider a matter resolved on a prior appeal. Id. at 1488-89. The rule prevents questions already considered and decided once in the case from being reargued at every subsequent stage of the case. Id. at 1489. The statement made by this court in Hale was not an issue that was "resolved" or "considered and decided" by this court. Instead, this court was simply reciting the history of the case, thus there is no "law of the case" on this point.

under which the defendant was convicted. If "evidence necessary to prove the federal charges would not be sufficient to prove the state charges, and vice versa," then section 25 has not been violated. Russell, 654 P.2d at 1062-63; Hubbell v. State, 585 P.2d 369, 374 (Okla. Crim. App. 1978) (same). Thus, if the evidence used to prove the federal crime is insufficient to prove the state crime and vice versa, the trial in the federal court would not bar a subsequent prosecution in state court, even though the underlying facts are the same. Russell, 654 P.2d at 1063.

In the federal prosecution, Hale was charged with violating the Hobbs Act, 18 U.S.C. § 1951. That statute provides that:

> (a) Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined not more than $10,000 or imprisoned not more than twenty years, or both.

The Supreme Court has found that there are two essential elements of a Hobbs Act crime: "interference with commerce, and extortion." Stirone v. United States, 361 U.S. 212, 218, 80 S. Ct. 270, 4 L. Ed. 2d 252 (1960).

Hale was prosecuted in state court in Oklahoma for kidnapping for extortion, Okla. Stat. tit. 21, § 745. The kidnapping statute reads as follows:

> A. Every person who, without lawful authority, forcibly seizes and confines another, or inveigles or kidnaps another, for the purpose of

extorting any money, property or thing of value or advantage from the person so seized, confined, inveigled or kidnapped, or from any other person, or in any manner threatens either by written instrument, word of mouth, message, telegraph, telephone, by placing an ad in a newspaper, or by messenger, demands money or other thing of value, shall be guilty of a felony, and upon conviction shall suffer death or imprisonment in the penitentiary, not less than ten (10) years.

Oklahoma has stated that this statute requires that a jury find four essential elements: "(1) an unlawful, (2) forcible seizure and confinement (3) of another (4) with the intent to extort a valuable thing or advantage from any person." Turner v. State, 786 P.2d 1251, 1254 (Okla. Crim. App. 1990).

Upon looking at the elements that need to be proven by the State, it becomes clear that under each statute the state or federal government must prove an element not necessary to any other charge. In the Hobbs Act case, the federal prosecutor had to show that Hale's actions interfered with commerce. This evidence was not necessary to prove the state crime of kidnapping. Likewise, in the kidnapping charge the state prosecutor had to prove forcible seizure and confinement of another. This was not an element of the Hobbs Act. As the Oklahoma court stated in Hubbell:

> [A]lthough it appears that the same exhibits . . . were introduced in both federal and state courts, it does not follow that [Hale] was being tried twice for the same offense. . . . The evidence necessary to prove the federal offense would be insufficient to prove the state offense and vice versa. Therefore, the trial in federal court did not bar a subsequent prosecution in state court.

Hubbell, 585 P.2d at 374.

- 61 -

Therefore, it is clear that Oklahoma did not violate Okla. Stat. tit. 21, § 25 when it prosecuted Hale for kidnapping following the federal prosecution under the Hobbs Act. Since there was no violation of section 25, there can be no denial of a liberty interest predicated upon section 25. Thus, we deny relief under this claim.

### III. Brady claim

Hale next argues that he is entitled to habeas relief because the F.B.I. has continued to suppress evidence in its possession after Hale requested it pursuant to the Freedom of Information Act ("FOIA"), in violation of Brady v. Maryland, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d. 215 (1963). Appellee counters that this claim is procedurally barred.

Hale did not raise this Brady claim on direct appeal. On post-conviction review, the OCCA rejected this claim, finding that it could have been raised on direct appeal and was not; thus it was barred from being raised on post-conviction. Hale II, 807 P.2d at 268-69 (citing Okla. Stat. tit. 22, § 1086). "We may not consider issues raised in a habeas petition 'that have been defaulted in state court on an independent and adequate procedural ground, unless the petitioner can demonstrate cause and prejudice or a fundamental miscarriage of justice.'" Medlock v. Ward, 200 F.3d 1314, 1323 (10th Cir. 2000) (quoting

English v. Cody, 146 F.3d 1257, 1259 (10th Cir. 1998) (citing Coleman v.

Thompson, 501 U.S. 722, 749-50, 111 S. Ct. 2546, 115 L. Ed. 2d 640 (1991))).

We have recently recognized that Oklahoma's bar on raising claims on post-

conviction that could have been raised on direct appeal is an independent and

adequate state bar with regard to Brady claims. See Clayton v. Gibson, 199 F.3d

1162, 1175 (10th Cir. 1999); see also Okla. Stat. tit. 22, § 1086.[14]  As we stated in

Brecheen v. Reynolds, 41 F.3d 1343 (10th Cir. 1994), section 1086 "precludes

state collateral review of . . . issues that could have been raised on direct appeal

but were not." Id. at 1349 n.4.[15]  Furthermore, Hale has failed to show cause and

---

[14] "All grounds for relief available to an applicant under this act must be raised in his original, supplemental or amended application. Any ground finally adjudicated or not so raised, or knowingly, voluntarily and intelligently waived in the proceeding that resulted in the conviction or sentence or in any other proceeding the application has taken to secure relief may not be the basis for a subsequent application, unless the court finds a ground for relief asserted which for sufficient reason was not asserted or was inadequately raised in the prior application." Okla. Stat. tit. 22, § 1086.

[15] The federal district court determined that Oklahoma's procedural bar was not independent and adequate with regard to Brady claims. In reaching this conclusion, the district court looked to two Oklahoma cases in which the Court of Criminal Appeals did not apply the bar on Brady claims. See Rojem v. State, 925 P.2d 70 (Okla. Crim. App. 1996); Castleberry v. State, 590 P.2d 697 (Okla. Crim. App. 1979). In Rojem, the court addressed the Brady claim on post-conviction because new evidence, not previously discoverable, was presented to the court. See Rojem, 925 P.2d at 73-74. In Castleberry, the court addressed the Brady claim because it was inadequately raised on direct appeal. See Castleberry, 590 P.2d at 701. Both of these cases fall within the stated exception contained within § 1086. See Okla. Stat. tit 22, § 1086 (barring claims not raised on direct appeal unless the court "finds a ground for relief asserted which for sufficient reason

(continued...)

prejudice, or that a fundamental miscarriage of justice will occur if we do not address this claim. Thus, we conclude Hale is barred from raising this claim.

## IV. Change of Venue

Hale next argues that he was denied a fair trial when the trial judge failed to grant defense counsel's motion for a change of venue. On direct appeal, the OCCA, in a 2-1 decision, rejected this claim. Relying on the Supreme Court's decisions in <u>Irwin v. Dowd</u>, 366 U.S. 717, 81 S. Ct. 1639, 6 L. Ed. 2d 751 (1961), and <u>Murphy v. Florida</u>, 421 U.S. 794, 95 S. Ct. 2031, 44 L. Ed. 2d 589 (1975), the court found that Hale had failed to show that the pretrial publicity created actual

---

[15](...continued)
was not asserted or was inadequately raised in the prior application"). This Court has recognized that a state court finding of procedural default is adequate "if it is strictly or regularly followed." <u>Maes v. Thomas</u>, 46 F.3d 979, 986 (10th Cir. 1995) (quotation marks omitted). Adequacy requires "application of the rule 'evenhandedly to all <u>similar claims</u>.'" <u>Id.</u> (emphasis added). "The test . . . is whether the state courts' actual application of the particular procedural default rule to <u>all similar claims</u> has been evenhanded in the vast majority of cases." <u>Id.</u> (alterations and quotation marks omitted) (emphasis added). The two cases cited by the district court were not similar to the case in <u>Hale</u> because they fell within the statutory exception. Moreover, we have repeatedly found that Oklahoma has applied section 1086 consistently to preclude claims on post-conviction review which could have been raised on direct appeal. <u>See</u> <u>Brecheen</u>, 41 F.3d at 1356, <u>Steele v. Young</u>, 11 F.3d 1518, 1522 (10th Cir. 1993); <u>see</u> <u>also</u> <u>Smith v. State</u>, 878 P.2d 375, 377 n.2 (Okla. Crim. App. 1994) (applying section 1086 to preclude <u>Brady</u> claim not raised on direct appeal); <u>Banks v. State</u>, 810 P.2d 1286, 1289 n.2 (Okla. Crim. App. 1991) (same). Thus, we again conclude that section 1086 is an adequate state bar to <u>Brady</u> claims raised on post-conviction review that could have been raised on direct appeal.

or presumed prejudice. See Hale I, 750 P.2d at 134-35. The court noted that each of the jurors finally seated stated that he or she could set aside any opinion held and could be impartial. Id. In addition, every juror challenged for cause was dismissed. Under these circumstances, the court found that the trial court's decision to deny the motion for a change of venue was not an abuse of discretion. Id. at 135. The State argues that this determination was not an unreasonable application of Supreme Court precedent.

On February 22, 1984, Hale filed a petition for change of venue. On February, 24, 1984 a hearing was held on Hale's motion, during which time Hale's counsel presented the testimony of two county residents who testified that, in their opinion, based upon pre-trial publicity and conversations with citizens in the area, Hale would not be able to receive a fair trial because people had already decided Hale was guilty. Hale also introduced numerous articles published in the two newspapers with local circulation. At the conclusion of the hearing, the trial judge took the motion under advisement until after voir dire.

Prior to Hale's trial, the news coverage of Perry's abduction and murder, as well as the arrest and indictment and federal prosecution, was considerable. The newspaper accounts revealed details of the murder, kidnapping, ransom demand, and Hale's arrest and arraignment on federal charges, and further detailed the cost to the county associated with escorting Hale to court by federal marshals. The

articles included pictures of Hale and of the crime scene where Perry's body was eventually found. The paper also reported the impact on the community and the Perry family. One article discussed the fact that Hale had previous dealings with the bank in which he owed money, and also discussed related civil and criminal charges against Hale. The newspapers also reported the incident involving Brenda Allison, who claimed that Hale had told her that her husband was hurt in a car accident and offered her a ride just a day prior to Perry's abduction. When Perry was found guilty on the federal extortion charges, there were more articles in the newspaper. Several papers also reported the testimony of witnesses in the federal extortion case.

During voir dire, thirty-seven jurors were called and examined by the trial judge and the attorneys. Of those thirty-seven, only three stated they had no prior knowledge of the case. Twelve potential jurors admitted that they had held some opinion at some point about Hale's guilt. Six of these twelve were seated on Hale's jury. In addition, four potential jurors knew Hale or his family and eight knew the victim or his family. Furthermore, one of the jurors finally seated had discussed the case with one of the key witnesses at trial, Ms. Miller, but stated that she could be impartial. At the conclusion of voir dire, the judge asked the jurors if anyone seated could not be fair and impartial. No one responded. The judge then overruled the motion for a change of venue. This ruling, following the

inquiry by the court as to whether the jurors could be impartial, serves as a general finding by the court that the panel selected for the trial was impartial. See Church v. Sullivan, 942 F.2d 1501, 1518 (10th Cir. 1991) (holding that a trial judge's denial of a change of venue in connection with his statement that the court had found twelve impartial jurors and one alternate in two hours, served as a general finding of impartiality).

"We review the trial court's decision denying a transfer of venue for an abuse of discretion. We give great deference to the trial court's exercise of its discretion, and its decision is entitled to a presumption of correctness and will not be overturned unless there is manifest error." Stafford, 34 F.3d at 1565 (internal quotation marks and citations omitted); see also Mayes v. Gibson, 210 F.3d 1284, 1291 (10th Cir. 2000) (post-AEDPA). Our review of state court findings is limited in part because the "state trial judge had the benefit of observing the general demeanor of the jurors as the basis for his general finding [of impartiality]." Brecheen, 41 F.3d at 1350. Thus, a habeas petitioner attempting to show a due process violation because of a state trial judge's failure to grant a change of venue motion "must demonstrate either that the trial resulted in actual prejudice or that it gave rise to a presumption of prejudice because it involved 'such a probability that prejudice will result that it is deemed inherently lacking in due process.'" Id. at 1350 (quoting Estes v. Texas, 381 U.S. 532, 542-43, 85 S.

Ct. 1628, 1633, 14 L. Ed. 2d 543 (1065)); see also Murphy, 421 U.S. at 798-99 (discussing cases in which Supreme Court held due process violations had occurred after finding either actual prejudice or presumed prejudice).

1. Presumed Prejudice

The defendant bears the burden of establishing that prejudice should be presumed. See Stafford v. Saffle, 34 F.3d 1557, 1566 (10th Cir. 1994). In order to demonstrate that prejudice should be presumed, the defendant must "establish that an irrepressibly hostile attitude pervaded the community." Id. at 1567. "Simply showing that all the potential jurors knew about the case and that there was extensive pretrial publicity will not suffice to demonstrate that an irrepressibly hostile attitude pervaded the community." Id. Presumed prejudice is "rarely invoked and only in extreme circumstances." Id.

The Supreme Court has presumed prejudice in only a small number of cases. In those cases where the Court has presumed prejudice, however, "the influence of the news media, either in the community at large or in the courtroom itself, pervaded the proceedings," Murphy, 421 U.S. at 799, and created either a circus atmosphere in the court room or a lynch mob mentality such that it would be impossible to receive a fair trial. See Sheppard v. Maxwell, 384 U.S. 333, 86 S. Ct. 1507, 16 L. Ed. 2d 600 (1966) (finding a due process violation from five

- 68 -

volumes of news clippings, accommodation for the press in the courthouse and courtroom, publication of potential juror's names and addresses allowing the public to contact potential jurors pretrial); Rideau v. Louisiana, 373 U.S. 723, 83 S. Ct. 1417, 10 L. Ed. 2d 663 (1963) (finding due process violation after defendant's filmed confession was repeatedly broadcast on the local television news of the small town); Estes 381 U.S. at 545-51 (presuming prejudice based on pretrial and trial media coverage that resulted in a disruptive circus atmosphere that deprived the defendant of the solemnity and sobriety to which a defendant is entitled).

The facts of this case do not rise to the level of those in Rideau, Sheppard, or Estes. Although Hale presented evidence of approximately thirty newspaper articles written about the case, these articles alone are not sufficient to show that prejudice should be presumed, particularly given the fact that they were written over a five month period with the largest volume dating from several months before Hale's trial. As the Supreme Court stated in Murphy, a jury's exposure to a "defendant's prior convictions or to news accounts of the crime with which he is charged" cannot alone demonstrate that the defendant was denied due process. 421 U.S. at 799. The evidence does not demonstrate that the pre-trial publicity had created such a media frenzy or circus atmosphere that Hale could not possibly have received a fair trial. Thus, Hale has failed to meet his burden of showing

that an irrepressibly hostile attitude pervaded the community such that prejudice could be presumed.

2. Actual Prejudice

Hale also seems to suggest that the voir dire proceedings showed actual prejudice based on responses of actual and potential jurors, almost all of whom had heard about the case and some of whom had formed opinions based on pretrial publicity. "We review actual prejudice by examining the totality of the circumstances." Stafford, 34 F.3d at 1567. "Due process requires that the accused receive a fair trial by an impartial jury free from outside influences." United States v. Abello-Silva, 948 F.2d 1168, 1177 (10th Cir. 1991) (quoting Sheppard, 384 U.S. at 362). "The trial court has broad discretion in gauging the effects of allegedly prejudicial publicity and in taking measures to insure a fair trial." Id. (quotation marks omitted). The trial court in this case made a general finding that the jury was impartial. The Supreme Court has stressed that partiality does not mean:

> that the jurors be totally ignorant of the facts and issues involved. In these days of swift, widespread and diverse methods of communication, an important case can be expected to arouse the interest of the public in the vicinity, and scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case. This is particularly true in criminal cases. To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is

> sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court.

Irwin, 366 U.S. at 722-23.

In this case, twelve out of thirty-seven jurors questioned had opinions. Six out of those twelve were dismissed and six were seated on the jury. These six all testified that they could put aside their opinions and judge the case on the facts. Moreover, the trial judge asked twice whether there were any jurors who felt they could not be impartial. No juror responded. See Yount, 467 U.S. at 1035 (stating that the relevant inquiry is whether the jurors at the defendant's trial "had such fixed opinions that they could not judge impartially the guilt of the defendant"); see also Stafford, 34 F.3d at 1567 (finding petitioner had failed to show jury was not impartial despite fact that one juror stated that "I will do my best" when asked whether he could keep the knowledge of one set of murders for which the defendant had previously been tried and convicted, separate from the current set of murder charges). Furthermore, after reviewing the voir dire proceedings, there is no indication from the jurors' responses that there was an atmosphere of hostility toward the defendant, nor did the trial court have a difficult time in seating the jury.

As the OCCA explained, the facts of this case are in contrast to Irwin v. Dowd, in which the Supreme Court found actual prejudice. In Irwin, over ninety

percent of the 430 prospective jurors interviewed entertained some opinion as to guilt, 268 were dismissed for cause, and eight out of the twelve jurors actually seated stated they believed the defendant was guilty. Irwin, 366 U.S. at 727. Based on these facts and the obvious hostility towards the defendant revealed during voir dire, the Court determined the defendant could not have received a fair trial. The totality of the circumstances of this case do not compare to the situation presented in Irwin. Here, none of the seated jurors stated unequivocally that they believed Hale was guilty, nor was there a showing that any of the seated jurors had such fixed opinions that they could not judge the case impartially. Moreover, out of 37 jurors called only eight jurors were dismissed for cause. Thus, the trial court did not encounter the same difficulty in seating a jury that the court in Irwin confronted. It is also clear from reading the voir dire in this case, that there was not the vehement hostility present in the jurors' responses that the Supreme Court found important in Irwin. Id. at 726-27. Therefore, viewing the totality of the circumstances present during voir dire, we cannot conclude that the trial court's finding that the jury was impartial was in error. Thus, the OCCA's determination that the trial court did not abuse its discretion in denying the motion to change venue was not an unreasonable application of federal law as interpreted by the Supreme Court.

## V. "Avoid Arrest or Prosecution" Aggravator

Hale argues there was such a lack of evidence to support the aggravator that the murder was committed to avoid arrest or prosecution that his federal constitutional rights were violated. Jackson v. Virginia, 443 U.S. 307, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979). Hale did not raise this claim on direct appeal. On post-conviction review, the OCCA determined that this issue was barred because it could have been raised on direct appeal, but was not. Hale II, 807 P.2d at 269.[16] Because Hale's claim of insufficient evidence was not adjudicated on the merits in state court proceedings, the new standard articulated in § 2254(d) does not govern our review. See Hooks v. Ward, 184 F.3d 1206, 1223 (10th Cir. 1999).

On a constitutional claim that there was insufficient evidence, we must determine whether "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Foster v. Ward, 182 F.3d 1177, 1194 (10th Cir. 1999). To support a finding of the "avoid arrest or prosecution" aggravator, "the focus is on the defendant's intent, whether proved by the defendant's own

---

[16] Because Appellee has not raised procedural bar on this appeal, we decline to raise the issue sue sponte where Hale has not had an opportunity to show cause and prejudice. We therefore proceed to the merits of the claim. See Duvall v. Reynolds, 139 F.3d 768, 796 n.11 (10th Cir. 1998).

statement or through circumstantial evidence." Fox v. Ward, 200 F.3d 1286, 1301 (10th Cir. 2000). In addition, Oklahoma courts require the existence of a predicate crime apart from the murder from which the defendant sought to avoid arrest or prosecution. McGregor v. State, 885 P.2d 1366, 1385 (Okla. Crim. App. 1994). In the instant case, there was ample evidence from which a rational fact finder could conclude beyond a reasonable doubt that the aggravating circumstance was present. First, the Oklahoma Court of Criminal Appeals concluded that there was evidence that Hale knew or was familiar with the victim and his family. We agree, and Hale has presented no evidence to dispute this fact. In addition, there was testimony from a witness at trial that she saw Hale grab the victim, haul him over a fence, and shove him into his car, with no attempt by the defendant to conceal his identity. See Fox, 200 F.3d at 1301 (finding sufficient evidence to support avoid arrest aggravator and noting that defendants failed to conceal their identity to their victims). There was also testimony that Hale stated to a cellmate that he knew how to get rid of witnesses. Furthermore, there was clearly a predicate crime–kidnapping for extortion–apart from the murder itself from which Hale sought to avoid arrest or prosecution. Based on all of the foregoing circumstantial evidence, we find a rational trier of fact could find the aggravator was present beyond a reasonable doubt. Hale's claim for relief on this ground fails.

## VI. "Heinous, atrocious, or cruel" aggravator

Hale's final argument is that his death sentence should be set aside because the evidence was constitutionally insufficient to prove that he was personally responsible for inflicting the wounds Perry suffered prior to death. The OCCA reviewed the evidence on direct appeal and found that there was sufficient evidence to support the aggravator.

The appropriate standard for reviewing this claim is the rational factfinder standard established in Jackson v. Virginia, 443 U.S. 307 (1979).[17] The "especially heinous, atrocious, or cruel" aggravator is properly found when the murder was "preceded by torture or serious physical abuse." Medlock v. Ward, 200 F.3d 1314, 1321 (10th Cir. 2000) (per curiam). Torture includes "the infliction of either great physical anguish or extreme mental cruelty," while

---

[17] Prior to AEDPA, we reviewed sufficiency of the evidence challenges de novo. See Moore v. Gibson, 195 F.3d 1152, 1176 (10th Cir. 1999). Under AEDPA, however, our standard of review is not as clear. There is precedent in the Tenth Circuit that a sufficiency of the evidence challenge is a legal question and other precedent suggesting it is a question of fact. See Moore, 195 F.3d at 1176-77 (collecting cases on both sides). If we treat the issue as a legal determination, we look to 28 U.S.C. § 2254(d)(1) and determine whether the state court decision was contrary to or an unreasonable application of clearly established federal law. If, on the other hand, it is a factual question, we look to § 2254(d)(2) and decide whether the state court decision was an unreasonable determination of the facts in light of the evidence presented to the state court. Further, § 2254(e)(1) requires us to afford a presumption of correctness to a state court's factual findings. In this case, however, we do not determine which is the more appropriate analysis because Hale's claim lacks merit under either standard of review.

physical abuse requires evidence of conscious physical suffering.  Id.; Clayton v. Gibson, 199 F.3d 1162, 1177 (10th Cir. 1999).

In this case, there is evidence in the record that Perry received at least five gunshot wounds, only two or three of which were fatal–two shots to the head, and possibly one shot to the abdomen.  In addition, on the morning Perry was abducted, Ms. Miller testified that she saw a man, who appeared to be Perry, bent over holding his side and bleeding in the field crying for help.  She then witnessed Hale run towards Perry, pull him over a fence, and push him into his car.  The testimony of Ms. Miller was later corroborated by the finding of blood in the location where she saw Perry.  This evidence is consistent with conscious physical suffering.

Hale argues, however, that there was no evidence that he was the one to inflict the wounds on Perry.  First, this assertion flies in the face of the jury verdict of guilty on the first-degree murder charge.  The jury found Hale guilty for the murder of Perry.  There was more than sufficient evidence for the jury to find that Hale was guilty of Perry's murder.  We therefore find that a rational trier of fact could have found the "heinous, atrocious, or cruel" aggravator beyond a reasonable doubt.

## CONCLUSION

For the above-stated reasons, we DENY habeas relief and AFFIRM the decision of the district court.